UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------------- x

RNC CONSOLIDATED CASES,

Plaintiffs,

-against-

THE CITY OF NEW YORK, ET. AL.,

Defendants.

---------------------------------------------------------------------- x

**DECLARATION OF RAJU SUNDARAN**

(RJS)(JCF)

RAJU SUNDARAN, an attorney duly admitted to practice in the United States District Court for the Southern District of New York, declares under penalty of perjury and pursuant to 28 U.S.C. §1746 that the following is true and correct:

1. I am an Assistant Corporation Counsel in the office of MICHAEL A. CARDOZO, Corporation Counsel of the City of New York, attorney for defendants.

2. I am familiar with the facts and circumstances stated herein based upon personal knowledge, the books and records of the City of New York, and conversations with its agents and employees. I submit this declaration in support of defendants' memorandum of law in opposition to plaintiffs' motions for leave to amend their complaints, and to place the pertinent records before this Court.

3. Annexed hereto as Exhibit A are the relevant excerpts from the Declaration of Deputy Commissioner David Cohen, sworn to on June 6, 2007.[1]

[1] A complete copy of Cohen's Declaration can be provided upon the Court's request.

4. Annexed hereto as Exhibit B are the relevant excerpts from the deposition testimony of Deputy Commissioner David Cohen, dated March 28, 2007.

5. Annexed hereto as Exhibit C are the relevant excerpts from the deposition testimony of Chief Joseph Esposito, dated July 7th, July 11th, July 14th, and July 21, 2006.[2]

Dated: New York, New York
October 23, 2007

RAJU SUNDARAN (RS 8011)
Assistant Corporation Counsel

[2] Complete copies of all cited testimonies can be provided upon the Court's request.

# Exhibit A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

MICHAEL SCHILLER, FRANCESCA FIORENTINI, ROBERT CURLEY, and NEAL CURLEY,

Plaintiffs,

vs.

04 Civ. 7922 (KMK) (JCF)

The CITY OF NEW YORK; RAYMOND KELLY, Commissioner of the New York City Police Department; TERENCE MONAHAN, Assistant Chief of the Bronx Bureau of the New York City Police Department,

Defendants.

HACER DINLER; ANN MAURER; ASHLEY WATERS;

Plaintiffs,

04 Civ. 7921 (KMK) (JCF)

vs.

The CITY OF NEW YORK; RAYMOND W. KELLY, Commissioner of the New York City Police Department,

Defendants.

**DECLARATION OF DEPUTY COMMISSIONER DAVID COHEN**

**DAVID COHEN** declares, under penalty of perjury pursuant to 28 U.S.C. §1746, that the following statements are true and correct:

1. I am the Deputy Commissioner for Intelligence for the New York City Police Department ("NYPD"), a position I have held since February of 2002. In that capacity, I have

officer. Taken together with other documents a person may learn the scope of program activities, and number of undercover officers involved.

- **Description of activities** - Like date, time and place information, the descriptive details reported on will allow the person about whom the report is concerned or who may have been present during the activities reported on, to realize that someone present was an undercover police officer. With data from other sources and documents, a person may determine the identity of the undercover and the scope of all undercover work across the entire investigative program. Activities will also reflect the methods used by the undercovers and aspect of their tradecraft.

19. In sum, the presence of a high level of detail in the raw, unevaluated field intelligence reports makes it possible to connect strands of information which in turn, provides a factual basis from which the identity of sources, methods and capabilities can be determined.

**F. <u>Reasons Documents Should Not Be Released</u>**

20. I emphasize that the release of the raw unevaluated field reports and other documents because they provide direct or indirect information on sources and methods would severely compromise the intelligence capabilities of the NYPD. Such a compromise would greatly undermine our ability to address the threats to New York City noted in the Appendix as well as those threats yet to surface. Indeed, based on my forty-one years experience as a career intelligence officer it is my strongest professional view that the damage to the NYPD intelligence program, a program that has become an essential element in the public security and safety of New York City in this post 11 September 2001 era, from the release of such material would be severe and irreversible.

21. Contrary to the impression raised by the press, there was never an isolated "RNC Squad" whose work was separate and discrete from the rest of the Intelligence Division's information gathering mission. Indeed, most of the personnel, including undercover personnel, and all of the methodologies were, and are involved in all aspects of the Intelligence Division's information gathering and processing responsibilities. Consequently, sources and methods

damage resulting from the release of documents that I believe should be redacted or withheld, would impact on the entire intelligence program, not just a so-called "RNC Squad."

22.    The raw, unevaluated field intelligence reports co-mingle the substance of our information gathering effort with data that are both source and methods revealing. The raw, unevaluated field intelligence reports contain extremely detailed information about a particular activity including the geographic location, the premises, the time of meetings, numbers of persons present often identifying them by name, relationships between undercovers and confidential informants and other contacts they might have, as well as methods of communication and the means by which information is gathered. Any attempt to remove the sensitive information which provides a basis for determining sources and methods would be futile, resulting in pages of meaningless snippets of text and punctuation.

23.    The presence of the high level of detail in the raw, unevaluated field intelligence reports makes it possible to connect strands of information which in turn, provides a factual basis from which the identity of sources could be deduced and the Intelligence Division's methods of operation revealed. Open source information makes it clear that there are individuals and groups that would welcome the opportunity to connect the strands of information in the raw, unevaluated field intelligence reports. To confirm that fact one need only go to the website titled "whosarat.com" which bills itself as the largest online database of informants and agents.

24.    Open source information from the reports produced in the case and referred to in the Appendix gives an indication of how individuals and groups intent on violence and disorder, including terrorist operatives, would welcome the information contained in the raw, unevaluated field intelligence reports. For example, "Marking Law Enforcement" was the name given to a tactic posted on the Internet, Appendix at 16, which advocated the identification of suspected law

that threatened to do so during the RNC. The disclosure of the raw, unevaluated, field intelligence reports would make it impossible to conduct effective investigations on such groups in the future.

G. **Conclusion**

30. In conclusion, I wish to state that it is my belief that releasing the raw unevaluated field intelligence reports and the redacted materials in other documents would cause certain and irreversible damage to the NYPD intelligence program, and, in turn, the NYPD's ability to defend New York City from another terrorist attack and other threats to the security and safety of the public.

Dated: New York, New York
June 6, 2007

David Cohen
Deputy Commissioner for Intelligence

# Exhibit B

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------x

MICHAEL SCHILLER, et al.,

Plaintiffs,

-against-

THE CITY OF NEW YORK, et al.,

Defendants.

-------------------------------------x

HACER DINLER, et al.,

Plaintiffs,

-against-

THE CITY OF NEW YORK, et al.,

Defendants.

-------------------------------------x

March 28, 2007
10:10 a.m.

**CONFIDENTIAL**

DEPOSITION of DAVID COHEN, taken by the Plaintiffs, at the law offices of NYCLU, 125 Broad Street, New York, New York before Karen Perlman, a Shorthand Reporter and Notary Public within and for the State of New York.

GREENHOUSE REPORTING, INC.
363 Seventh Avenue - 20th Floor
New York, New York 10001
(212) 279-5108

(The following portion of the record is read:

"QUESTION: What are your general responsibilities in that position?")

A. In the broader sense, my responsibility is to advise the Police Commissioner on threats to the public security and safety of the City from outside the City and inside the City, the -- what is the nature of that threat, what form it takes, and how it might materialize and see its way through. And in many respects that's -- that's the most important function I serve.

The -- the corresponding responsibility is to oversee the -- and provide the leadership and -- and oversee the management of the NYPD Intelligence Division.

Collateral to those responsibilities is to sustain -- to develop and sustain liaison relationships on behalf of the Department with other law enforcement and intelligence agencies, locally, regionally, nationally, and internationally.

Q. You mentioned that amongst your

D. Cohen - Confidential

Convention in approximately January 2003, were you assigned any responsibilities with respect to the NYPD's activities around the convention?

A. What do you mean by assigned activities?

Q. What I mean is, let's set aside the word assigned, did you assume any responsibilities with respect to the NYPD's involvement in the convention?

A. Yes.

Q. What generally were those responsibilities?

A. Well, as -- as I indicated before, my responsibility is to advise the Commissioner on -- on threats to the City from either from within or without, what -- what the nature of those threats might be, and what form they may take, and with that general responsibility, once the determination was made that -- that the RNC would be located in New York, and I believe that occurred in February, not January, I assumed responsibility for advising them, the -- the Commissioner and the Chief of the Department, I might add, on those aspects of the -- the RNC.

D. Cohen - Confidential

time, and you have many things in your life happening.

A. Right, right.

Q. There was a period of time where all of a sudden the convention was coming and you talked.

A. Exactly. At some point I would have said to the Commissioner, you know, the Intelligence Division will be responsible for articulating for him and the Department leadership anything we -- we determine would pose a threat to the safe undertaking of the -- the RNC event.

Q. What do you recall, if anything, and I realize again, there are a lot of things happening here, what do you recall about the particulars of your early conversations about what it was that the Intelligence Division specifically would be doing?

A. Well, in -- in those early months after the announcement was made that the RNC would come to New York, there was a very public reaction with respect to the, you know, reconstructing the times, there is a lot of

D. Cohen - Confidential

executive group, but let me just make sure we're talking about the same thing.

He, as I recall, testified that he was a regular member of that, that First Deputy Commissioner Grosso was a member of that. I believe he testified that you had participated in those meetings, I don't want to say all the time but often, and I must say I don't remember him saying anything about Mr. Sheahan, was the Deputy Commissioner for counterterrorism part of that group?

A. Chris, I honestly don't remember the permanent membership. It may have changed, depending on the issue of the week, or the bi-weekly -- I know two people were always there, and that was Commissioner -- and that is when I was there, Commissioner Kelly, and the Chief of Department.

Q. That is the same thing that he said. He said that two people were always at those meetings were the two of them.

A. There you go.

Q. There we go.

So this group got set up, we have a

D. Cohen - Confidential

MR. FARRELL: Objection.

A. -- characterization of it. It wasn't political surveillance.

Q. Okay.

A. This was information gathering to assure the security of the City and the estimated 800,000 people who came to participate in protest activities.

Q. Well, I don't want to use a term that you will consider misleading.

A. There was no political surveillance, this was a program designed to determine in advance the likelihood of unlawful activity or acts of violence.

Q. And as I understand your testimony, within the Intelligence Division there was no name given to this program?

A. There was no name given to this program.

Q. Are you familiar with the term special opp?

A. Yes.

Q. Was that a term that was used to describe this program?

D. Cohen - Confidential

the use of the word "program" or its continued use.

Q. Who made the decision to undertake this program?

MR. FARRELL: Objection.

A. I made the decision to initiate an effort of information gathering with an eye towards identifying the possibility of unlawful activity and/or violence in New York City during the period immediately before and during the Republican National Convention.

Q. Did there come a point in time in which you informed Commissioner Kelly that you had made that decision?

A. It was marbled into life at the time.

Q. That is an expression I remember you using before.

A. Hmm?

Q. I said that is an expression that I remember you using before in a different context, but what I'm asking you is, understanding that, does that mean that yes, there was a point in time in which you informed or Commissioner Kelly

The investigations that took place following these leads in fact produced information for the Intelligence Division, is that fair to say?

A. Yes.

Q. And where I started with this was about the periodic briefings that you provided to the RNC executive group.

And the question I asked you was did those briefings include information about the investigations that were conducted by the Intelligence Division following the leads that you said were produced through the on-line investigation, or the on-line review process?

MR. FARRELL: Objection.

A. The -- the information -- the overwhelming proportion of the intelligence, I would have used in the briefings of the executive committee would have emanated from the things we were learning from the on-line research effort, not exclusively, but predominantly.

Q. So I take it then that it would be fair to say that setting aside the exact proportions, that information that was gathered

through the investigations that took place was part of the information that was conveyed through these briefings to the RNC executive group?

MR. FARRELL: Objection.

A. Because I sat through the pre-break discussion, I'm educated by it, or informed by it.

The -- the -- again, I want to emphasize the predominant share of the information that I used to brief the executive committee and Commissioner Kelly would have come from what is in this pile.

Q. I understand you're using the term "predominant", but you also made it quite clear it was not the exclusive source of that information?

A. Correct.

MR. DUNN: So, Peter, I think we should call Judge Francis, and I think we should schedule a time to talk to him, if he can see us now, talk to us in a half an hour, we can do that.

MR. FARRELL: Are you proposing here, you're saying you want to call him

know what was happening, guidance, whatever, was in writing?

MR. FARRELL: Objection.

A. My guess is it was not in writing.

Q. Do you recall ever seeing any written guidance or instructions to Captain DiMartino or to the people working under his supervision about the identification of relevant RNC information that would be then forwarded to the Chiefs for consideration?

A. Say that again, because my mind went someplace else, I'm sorry.

MR. DUNN: Read that back.

(The record is read.)

A. I think, and again, this is how I believe it worked, streams of reporting or knowledge coming from this effort could have taken different forms. We just uncovered that there is a plan or people are starting to talk about doing this bad thing. If there were a website, a chat room that said no, we shouldn't do those things, both pieces of information would have moved up.

Q. Okay, I understand that. What I'm

# Exhibit C

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------x

MICHAEL SCHILLER, et al.,

Plaintiffs,

-against-

THE CITY OF NEW YORK, et al.,

Defendants.

-------------------------------------x

HACER DINLER, et al.,

Plaintiffs,

-against-

THE CITY OF NEW YORK, et al.,

Defendants.

--------------------------------------x

July 7, 2006
10:00 a.m.

Deposition of JOSEPH ESPOSITO, held at the offices of NEW YORK CIVIL LIBERTIES UNION, 125 Broad Street, New York, New York, before Vicky Galitsis, a Certified Shorthand Reporter and Notary Public of the State of New York.

GREENHOUSE REPORTING, INC.
363 Seventh Avenue - 20th Floor
New York, New York 10001
(212) 279-5108

E. Esposito

there have been conversations with Commissioner Kelly about the department's practice of not issuing C summonses at certain designated events?

MR. FARRELL: Objection.

A. Not that I recall.

Q. Do you know of any situations in which Commissioner Kelly was the one who made the decision to institute this policy for a particular event, setting aside the convention?

MR. FARRELL: Objection.

A. Not that I recall.

Q. Do you know of any instance in which you are the one who made the decision to institute this policy for a particular event other than the convention?

MR. FARRELL: Objection. You keep calling it a policy. He used the word strategy as an option.

My continuing objection is to the form of the question and your use of the word policy.

A. Not that I recall.

other executives. But again at some of those meetings there were presentations made by the committees. So those presentations were preserved, I would assume.

Q. Beyond Commissioner Kelly and perhaps First Deputy Commissioner Grosso and yourself, is there anyone else who was a regular participant in those meetings?

MR. FARRELL: Objection.

A. I can't say for sure. I'm not even sure, as I said, about Grosso.

Q. I understand that. That's why I said perhaps Commissioner Grosso.

You also mentioned tabletop exercises. What were you referring to?

A. I believe we had one at -- if my memory serves me -- we had an exercise at the Garden, and it was a multi-agency exercise tabletop exercise, and I believe that had to do with the RNC. I could be mistaken.

I remember going to one at the Garden. A lot of federal agencies were there, state agencies, a lot of different agencies were there. And I believe that was in regards

E. Esposito

A. I had to go through the whole thing. I'm sure we approved the vast majority of it. I don't know if it was all approved.

Q. I'm happy to go through it now or you can go through it over the weekend and we can talk about it on Monday.

A. Sure, I'll go through it now.

I think this was approved. I don't recall any changes.

Q. Was Commissioner Kelly present for this executive staff meeting?

A. Yes.

Q. Did he participate in the approval of this plan?

A. Yes.

Q. Do you know why there was a special procedure set up for the August 29th UPJ event?

A. Just because of the size of it, you know. It was going to be a massive amount of people participating. So we wanted to be ready for it.

Q. As I understand this document, and I'm looking at the page that Bates stamped

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------x

MICHAEL SCHILLER, FRANCESCA FIORENTINI, ROBERT CURLEY and NEAL CURLEY,

Plaintiffs,

- against - 04 Civ. 07922

THE CITY OF NEW YORK; RAYMOND KELLY, Commissioner of the New York City Police Department; TERENCE MONAHAN, Assistant Chief of the Bronx Bureau of the New York City Police Department,

Defendants.

-----------------------------------------x

July 11, 2006
10:05 a.m.

Deposition (Continued) of CHIEF JOSEPH ESPOSITO, taken by the Plaintiffs, pursuant to Order and Adjournment, at the offices of New York Civil Liberties Union, 125 Broad Street, New York, New York, before Loretta M. Bodtmann, a Shorthand Reporter and Notary Public within and for the State of New York.

GREENHOUSE REPORTING, INC.
363 Seventh Avenue - 20th Floor
New York, New York 10001
(212) 279-5108

J. Esposito

Chief Esposito, to the extent you can recall -- if you don't recall you should tell me -- to the extent you can recall, what specific information was provided to you and Commissioner Kelly at the Executive Staff meeting that was taken into account at that meeting in making the decision to adopt the no-summonses policy for the Convention?

MR. FARRELL: Objection.

A. I want to make it clear. There is an Executive Staff briefing for the RNC. They are two different meetings. You are talking about a meeting when we were discussing the RNC.

Q. Yes, I'm sorry. As you recall you described the special RNC meeting as being in the form of an Executive Staff meeting?

A. Yes.

Q. I'm referring to those particular meetings?

A. Okay.

Q. As I understand it, there was a meeting where, setting aside the specific date of that meeting, a decision was made to put in

place a no-summonses policy during the Convention, is that correct?

A. Yes.

Q. I'm going to focus on that meeting.

A. Yes.

Q. At that meeting, what recollection, if any, do you have about the specific factual information that was provided to you and Commissioner Kelly on the issue of whether or not the Department should adopt a no-summonses policy for the Convention?

MR. FARRELL: Objection.

A. A decision was made after recommendations by the committee that dealt with the whole arrest processing area of the Convention. The sort of things that we took into consideration would have been --

Q. Okay, when you say would have been, let me stop you. I want to make sure you're testifying to what you recall as opposed to what would have been.

A. Right.

Q. As you sit here now, do you recall the conversation?

Commissioner Kelly received that formed the basis for the Convention's no-summonses policy?

MR. FARRELL: Objection.

A. Not that I recall right now.

Q. Was the decision to adopt a no-summonses policy for the Convention a decision that would have been jointly made by you and Commissioner Kelly?

A. Ultimately it is his decision.

Q. Do you recall him saying any words at the meeting where the decision was made in which he expressed his views or his decision that that would be the policy?

MR. FARRELL: Objection.

A. I don't recall.

Q. In your testimony on Friday you mentioned that since the Convention there are now some circumstances in which DATs could be issued without a person being fingerprinted.

Do you recall that testimony?

A. Yes.

Q. What are the circumstances under which that can now take place?

MR. FARRELL: Objection.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------x
MICHAEL SCHILLER, et al.,
Plaintiffs,
-against-
THE CITY OF NEW YORK, et. al.,
Defendants.
------------------------------------x
HACER DINLER, et al.,
Plaintiffs,
-against-
THE CITY OF NEW YORK, et. al.,
Defendants.
------------------------------------x

July 14 2006
10:02 a.m.

Continued Deposition of Defendant, by JOSEPH ESPOSITO, taken by Plaintiffs, pursuant to Adjournment, at the offices of New York Civil Liberties Union, 125 Broad Street, New York, New York 10004, before Angela Castoro a Shorthand Reporter and Notary Public within and for the State of New York.

GREENHOUSE REPORTING, INC.
363 Seventh Avenue - 20th Floor
New York, New York 10001
(212) 279-5108

J. Esposito

used "your." He's not being specific as to who. So my "your" is as unspecific as his "we."

MR. FARRELL: To the extent that that question calls for anybody's comments other than the final decision-maker on the mass arrest processing plan, I am going to instruct the witness not to answer that. I am going to assert the deliberate process.

Q. Did Commissioner Kelly express any qualms with regard to any aspects of the final ultimate mass arrest plan?

A. No qualms.

Q. Okay. Is what you're saying about the way decision-making works in the executive staff, that other members of the executive staff may give advisor guidance to the police commissioner, but that any ultimate decision is ultimately his and there is only one ultimate decision-maker within the New York City Police Department and that's Commissioner Kelly?

MR. FARRELL: Objection.

J. Esposito

A. No, there is not -- there is not only one decision-maker.

Q. Okay. Was there anybody else on the executive staff who acted as an ultimate decision-maker with regard to the mass arrest processing plan for the Republican National Convention?

MR. FARRELL: Objection.

A. No.

Q. Was there anybody else on the executive staff who acted as a final decision-maker for any other aspects of the RNC plan as were put forth in terms of operations on the street or the purview of any of the other RNC committee or was Commissioner Kelly still the ultimate and only decision-maker?

MR. FARRELL: Objection. And I specifically object to the breadth and overbreadth of that question.

A. When we plan, the RNC committees are formed. Decisions are made. These decisions or -- I guess they are recommendations, the whole plan is brought to

the police commissioner, is presented to him by myself, other members of the executive staff. His seal of approval goes on the plan. Much of that plan takes in decisions made by other people. So that decision is made by someone else.

But ultimately I guess by definition it's a recommendation until it's approved by the police commissioner. Yes, I guess it's a recommendation.

Q. I mean, in some other circumstances within the police department when we're not dealing with large events, special events like the RNC, the police commissioner delegates ultimate decision-making power to yourself or other high members?

A. Yes.

Q. Doesn't personally review them, correct?

A. Yes.

Q. But during the RNC, my question is whether or not the police commissioner had to personally review and ultimately sign off

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------x

DEIDRE MACNAMARA, ET AL.,

Plaintiffs, Case No.

-against- 04 CV 9216 (KMK)

THE CITY OF NEW YORK, ET AL.,

Defendants.

---------------------------------x

July 21, 2006
10:35 a.m.

CONTINUED DEPOSITION of JOSEPH ESPOSITO, taken pursuant to Notice, at the Offices of Corporation Counsel, 100 Church Street, New York, New York, before Marion Frola, a Shorthand Reporter and Notary Public of the State of New York.

GREENHOUSE REPORTING, INC.
363 Seventh Avenue - 20th Floor
New York, New York 10001
(212) 279-5108

MR. FARRELL: Objection. I instruct the witness not to answer that on the basis of deliberative process, and also note for the record that this entire area of inquiry has been gone over in the prior three days.

Q. In any event, you were comfortable with the decision and it was a decision that was ultimately, as far as you know, signed off on by Commissioner Kelly, correct?

MR. FARRELL: Objection.

A. Yes.

Q. Was it a decision in which -- without telling me what his position was -- was Chief of Patrol Estavillo involved in the decision as to whether to adopt a no summons rule or not?

A. I don't know if he was at that meeting.

Q. How about the first deputy commissioner, was it George Grasso at the time?

A. It was George Grasso, and I believe he was at the meeting, and I think Estavillo was at the meeting also, I'm just not positive.

Q. But it's your memory that the origin